UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

            v.                          18 CR 390 (PAE)

MARIE PALUMBO,
                                        Bail Hearing
            Defendant.

------------------------------x

                                        New York, N.Y.
                                        June 5, 2018
                                        4:45 p.m.

Before:

        HON. PAUL A. ENGELMAYER

                                        District Judge


        APPEARANCES


GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
MICHAEL K. KROUSE
STEPHANIE L. LAKE
     Assistant United States Attorneys


NICOLE WAKNINE
     Attorney for Defendant


Also Present:

     ANTHONY SNEAD – Special Agent FBI
     WINTER PASCUAL – Pretrial Services Officer
     FRANCESCA MILLER – Pretrial Services Officer
     JOSHUA ROTHMAN – Pretrial Services Officer

(Case called)

THE COURT:  Good afternoon.

This case has just been assigned to me today.  I scheduled today for Thursday an initial conference in the case in which all defendants will appear and we will take stock of the case in the usual way.  About half hour, 45 minutes ago, my chambers were notified that the government wished to appeal a bail determination made by Judge Lehrburger.  In the interests of efficiency, knowing that everybody was here, and the interests of coming to a resolution promptly, I directed that we have this conference now so we could get to the bottom of it.

With that, in a moment I will turn to you, Mr. Krouse, to tell me about the case.  I do, though, need to make a disclosure, which is that in 2013 to 2014 Mr. Krouse served as one of my law clerks.  I'm quite confident that does not impair my ability to preside over this case, but I also wanted to make sure that the disclosure was on the record.

MS. WAKNINE:  Thank you, your Honor.

THE COURT:  Mr. Krouse, tell me a little bit about the case writ large and then specifically about Ms. Palumbo.

MR. KROUSE:  Yes, your Honor.  As your Honor referenced, the indictment in this case was unsealed today.  17 defendants are named in that indictment and all 17 have been arrested.  3 of them will be presented tomorrow and 14 are

being presented today, including Ms. Palumbo.

THE COURT:  Are the presentments going on even as we speak?

MR. KROUSE:  Yes, your Honor, there are presentments going on as we speak.  Two defendants are in hospitals right now being examined and will be presented tomorrow.  Your Honor, 13 defendants haven detained and one defendant has been released on a bail package that the government and defense counsel agreed to.

THE COURT:  14 of the 17 have been presented.

MR. KROUSE:  Or are about to be presented.

THE COURT:  That does or does not include Ms. Palumbo?

MR. KROUSE:  That does not include Ms. Palumbo.  Ms. Colombo has also been presented in magistrate's court.

THE COURT:  So she the 15th?

MR. KROUSE:  Yes, your Honor.

THE COURT:  There are two others that will be presented tomorrow?

MR. KROUSE:  Yes, your Honor.  The indictment, broadly speaking, alleges one count of a violation of Title 21, United States Code, 846, alleging that the 17 defendants conspired together to violate the narcotics laws of the United States: Namely, that they conspired to distribute 400 grams and more of fentanyl and 1 kilogram and more of heroin.

Your Honor, the overall conspiracy operated from an

area in the Bronx from 182nd Street to 184th Street between Jerome Avenue and University Avenue. The conspiracy was led by the first defendant named in the indictment, Maurice Hartley, otherwise known as Bugs. Mr. Hartley operated this drug conspiracy at least from 2015 up to and including June 2018. The government believes and will proffer to the Court that this conspiracy over the course of 3 years, the evidence would establish that that conspiracy distributed in excess of 150 kilograms of heroin, most of it mixed with fentanyl.

THE COURT: To cut you off for a moment, the allegation in the indictment is simply to get over the statutory floor for a (b)(1)(A)?

MR. KROUSE: Yes, your Honor.

THE COURT: But in fact the proffer is that the proof would show in excess of 150 kilograms?

MR. KROUSE: Yes, your Honor.

THE COURT: Can you tell me what fentanyl is. Tell me a little bit about the toxic significance of the respective drugs.

MR. KROUSE: Yes, your Honor. Fentanyl is a synthetic opioid. It is a synthetic form of heroin that is quite a bit stronger, maybe a hundred times stronger, than heroin. It is often used by drug-trafficking organizations who are selling heroin to mix with their heroin to make it more potent, therefore requiring the drug-trafficking organization to put

less heroin in the overall substance, more what is known as cut, which has no narcotic effect, and then an amount of fentanyl to increase the potency, and therefore make it cheaper for the drug-trafficking organization to supply the heroin that they then sell.

Oftentimes the end user of the product does not know what's in the product they are buying. They don't know if it is pure heroin or if it is heroin mixed with a cutting agent and fentanyl. All they know is the effect that they get which approximates heroin.

THE COURT: As an aside, if the end user looking at the same quantity misread the quantity as being predominantly or all heroin where some was fentanyl, there would be a risk of overdose?

MR. KROUSE: Yes, your Honor. In this case specifically the indictment alleges that there are five over-dose deaths that can be connected to the drug-trafficking organization. To be clear, the government hasn't presented to the grand jury a charge related to those overdose deaths and the grand jury hasn't returned a charge relating to those overdose deaths.

But those overdose deaths can be connected to the drug-trafficking organization because the government has a cooperating witness who would be prepared to testify that that drug-trafficking organization utilized what are known as stamps

on their glassines of heroin.

A glassine is a single-use amount intend to be used by a single user. On that glassine oftentimes drug-trafficking organizations will place a stamp to brand their product and communicate to their customers that that product comes from a particular drug-trafficking organization. The government's proof would show that there were five overdose deaths which started in September 11, 2017, the last overdose death being on January 2, 2017, when there were two deaths.

THE COURT: February 2nd or January?

MR. KROUSE: January 2nd, your Honor. That day had two deaths. And all five of those deaths are connected to the drug-trafficking organization based on the stamps that were recovered from the overdose victims and also by the fact that all five of those overdose victims were found in locations near where the drug-trafficking organization operated.

That is the overall organization. Just today, your Honor, upon arresting the 17 members of the conspiracy, the government also executed five search warrants and then a follow-on search warrant of a storage locker. The government recovered approximately 3 kilograms of what appears to be heroin, recovered over $300,000 in cash, and we recovered a loaded firearm, all from members of the conspiracy.

From the government's perspective, the proof in this case will be extremely strong. The government has a

cooperating witness. The cooperating witness's evidence will be corroborated extensively. The cooperating witness engaged in proactive cooperation. There are recorded phonecalls. There are control buys from members of the conspiracy. There is extensive physical surveillance conducted by law enforcement agents.

There is GPS data on vehicles. There are GPS orders that were placed on various phones of members of the conspiracy, all of which will corroborate the cooperating witness's testimony that Maurice Hartley ran an extensive drug-trafficking organization for over 3 years that distributed over 150 kilograms approximately of heroin mixed with fentanyl, and that that drug-trafficking organization sold heroin mixed with fentanyl that resulted in at least five overdose deaths within or around their drug-trafficking territory.

THE COURT: A few questions before you turn to the individual defendant. Right now I understand that it is a bare-bones indictment that doesn't include charges, for example, keyed to the deaths. I take it that that is theoretically available subject to the proof, that there is a statute that would allow you to supersede with counts that pick up on the fact of the deaths.

MR. KROUSE: Yes, your Honor, there is a statute available to the government that the government is continuing to investigate. We weren't in a position, frankly, to charge

those overdose deaths as violations of 841(b)(1)(C) leading to death or substantial bodily injury, which carries a mandatory 20-year minimum sentence. But the government wanted to charge the case and arrest individuals in this drug-trafficking organization based on the fact that they are posing an extreme danger to the community.

THE COURT: I take it what you are saying is that you are not prepared to charge crimes relating to the five deaths now but that is a subject of continuing investigation?

MR. KROUSE: Yes, your Honor.

THE COURT: Does the death-resulting provision require substantive liability or can it be based on conspiratorial liability?

MR. KROUSE: Your Honor, it can be based on conspiratorial liability. The government can show that the conspiracy is responsible and it was foreseeable that the conspiracy would distribute an amount of heroin or fentanyl that would result in death.

THE COURT: To find any individual defendant liable with respect to a resulting death, what does the government need to prove?

MR. KROUSE: Your Honor, although I haven't charged that --

THE COURT: Right.

MR. KROUSE: -- my understanding is that the

government would have to prove that the overall conspiracy was responsible for selling what is known as the fatal dose or is in the stream of commerce of that fatal dose; that the dose was the but-for cause of the death or substantial bodily injury of the individual who suffered the drug overdose; and that as to an individual member of the conspiracy, it was foreseeable to that individual member of the conspiracy that a death could result or substantial bodily injury could result from the sale.

THE COURT:  Thank you.  Now turn to the individual defendant, Ms. Palumbo.

MR. KROUSE:  Yes, your Honor.  Ms. Palumbo is a significant drug trafficker within the overall conspiracy.  She was somewhat unique in that she didn't sell the drugs within the drug-trafficking territory, but she communicated and received her narcotics directly from the head of the conspiracy: namely, Maurice Hartley, a/k/a Bugs.

Ms. Palumbo lives in Elizaville, New York, which is about two hours to two and a half hours, depending on traffic, directly north of the Bronx along the Hudson River.  She lives there.  She would make the trip from Elizaville to the Bronx approximately twice a week.  Each time she made the trip to the Bronx, she would obtain 35 to 40 bundles of heroin mixed with fentanyl.  To inform the Court, a bundle is 10 individual doses of heroin.

THE COURT:  So 350 to 400 doses?

MR. KROUSE:  Exactly, your Honor, 350 to 400 individual doses of heroin twice a week.  Ms. Palumbo, our understanding is, would pay around $45 per bundle of heroin, which is approximately $2,000 for the amount that she was purchasing.  Based on the investigation and based on the evidence, the government would show that in Elizaville and in areas around Elizaville in upstate New York such a bundle would sell for approximately 100 to $120.  So there is a substantial price increase the further you get away from New York City.

Based on that amount, Ms. Palumbo was supplying 800 individual users in Elizaville or its surrounding area every week.  She would make that trip based on our GPS data --

THE COURT:  800 uses.  I assume that some users would have multiple purchases a week.

MR. KROUSE:  Yes, your Honor. Excuse me.  I misspoke.  800 individual doses of heroin per week to users in her community.  She would make that trip twice a week.  It's about two to two and a half hours each way.  Our GPS data would show her making those trips from Elizaville to the Bronx.  She would go directly to Maurice Hartley's stash location -- which, as a quick aside, your Honor, was searched today pursuant to a search warrant, and $30,000 cash and quantities of heroin and stamps were recovered from the stash location.

THE COURT:  Stamps consistent with the branding?

MR. KROUSE:  Yes, your Honor.  Ms. Palumbo would go

directly to that location. It is on Hoffman Street. Physical surveillance observed her outside of that location and on some occasions going inside that location, Mr. Hartley coming out --

THE COURT: What is the nature of the stash house? Does it serve any other purpose or is it just a stash house? Is it a residence, for example?

MR. KROUSE: It could be a residence, your Honor. It is a residential area. But nobody, as far as the government knows, lives in the stash house.

THE COURT: When you searched it, were beds and dressers there or is it just a stash house?

MR. KROUSE: It is just a stash house, your Honor.

THE COURT: So somebody who is there in that stash house is not there to sleep, something else is the purpose?

MR. KROUSE: Yes, your Honor. Maurice Hartley used to live in that stash location and then moved to a location on University Avenue, which was also searched pursuant to a search warrant.

THE COURT: Hartley lives elsewhere?

MR. KROUSE: He lives elsewhere and he was living elsewhere which the search warrant was executed today. He was arrested in his residence. That's where the government recovered the approximately 3 kilograms of heroin. And approximately $144,000 in cash was found within Mr. Hartley's residence.

Our GPS data from Mr. Hartley's phone and the GPS data from the tracker that was placed on Mr. Hartley's car shows that he sleeps in his residence, he is there late at night and early in the morning, and that he spends the vast majority of his daytime hours in the stash house location.

THE COURT: Back to Ms. Palumbo. You connected her to the stash house by surveillance seeing her going in and out?

MR. KROUSE: Surveillance of her going in and out or meeting with Mr. Hartley, him coming down sitting in her vehicle for a matter of two to three minutes, getting out, and then Ms. Palumbo returning directly to Elizaville. These are not long trips that Ms. Palumbo is taking to the Bronx. She is going straight to the stash house location and going straight back.

THE COURT: How long is she staying either in the stash house or with Mr. Hartley?

MR. KROUSE: A matter of minutes.

THE COURT: Could you see anything changing hands?

MR. KROUSE: Your Honor, the exchanges either happened inside the stash house or inside the vehicle.

THE COURT: But if she has as many bundles of 10 each, 350 to 400 doses, is she carrying a bag? What is your theory?

MR. KROUSE: It is relatively small, your Honor, to have 40 bundles. Each glassine is extremely thin and they are bound with a rubber band. The physical surveillance, for

instance, where Mr. Hartley comes down and sits in the vehicle, he is oftentimes wearing a hoodie and has his hands in his pockets and law enforcement's belief is that Mr. Hartley has the bundles in the bigger pockets in his hoodie and that he is handing them to Ms. Hartley.

THE COURT: Is this her car that he is sitting in?

MR. KROUSE: Her car.

THE COURT: So she doesn't have to, on your theory, physically leave the car with the bundles in hand. It's only Mr. Hartley who's got them, and your surmise is they are packed in his clothing?

MR. KROUSE: Yes, your Honor. The physical surveillance, to be clear, was done at some distance. This was a covert operation. The law enforcement agents didn't want to tip off anybody that they were conducting surveillance.

THE COURT: Can you proffer to me a minimum number of times in which the government could establish that she had visits of this nature with Mr. Hartley?

MR. KROUSE: Your Honor, to separate it from number of visits that would be established through the testimony of the cooperating witness, to address that first, the cooperating witness will testify that he personally provided 35 to 40 bundles of heroin to Ms. Palumbo two to three times per week himself.

THE COURT: For about how long a time?

MR. KROUSE:  For about a period of a year.

THE COURT:  Without holding you to it, approximately how many times do you have undercover corroboration of that?

MR. KROUSE:  May I have a moment, your Honor?

THE COURT:  Yes.

MR. KROUSE:  Your Honor, the physical surveillance has observed Ms. Palumbo at the location three to four times.

THE COURT:  Each time with Hartley?

MR. KROUSE:  Each time with Hartley.

THE COURT:  Or her going into the house?

MR. KROUSE:  Yes, going into the house.  The data corroboration, Ms. Palumbo's phone had a GPS on it for 45 days, and the government would proffer that in that period Ms. Palumbo made trips twice a week that was consistent with what the cooperating witness stated she was making those trips for.

THE COURT:  I take it this is not a Title III case.

MR. KROUSE:  No, your Honor.

THE COURT:  The state of the evidence then is cooperating witness, data corroboration, physical surveillance. Was there a search done in Elizaville?

MR. KROUSE:  There was not, your Honor, no.

THE COURT:  Any surveillance of what was going on in Elizaville when she comes back with the bundles?

MR. KROUSE:  No, your Honor.

THE COURT:  The evidence as to what she is doing at

Elizaville, does the CW know what she is doing or is it just a process of rational inference?

MR. KROUSE:  It is the latter, your Honor.  He doesn't know specifically what she does with it.  He assumes that she resells it.

THE COURT:  When did she last visit Hartley or the stash house?

MR. KROUSE:  May I have a moment, your Honor?

We are not sure exactly, your Honor, but there was a visit last week.

THE COURT:  Were any of the deaths outside of the Bronx?

MR. KROUSE:  There is a death in Yonkers that is connected to the drug-trafficking organization through the stamps.  But as far as the government is aware, there weren't deaths associated with the stamps in Elizaville.

THE COURT:  At this point any corroborative evidence of the stamps showing up in or around the Elizaville area?

MR. KROUSE:  Not yet, your Honor.

THE COURT:  Go ahead.

MR. KROUSE:  The one other category of evidence that I forgot to mention is that the toll analysis of Mr. Hartley's phone number and Ms. Palumbo's phone number connects the two having frequent conversations either by text message or by voice call.

THE COURT: Does Hartley have legitimate employment?

MR. KROUSE: No, your Honor.

THE COURT: Go ahead.

MR. KROUSE: The government believes that Mr. Hartley has no legitimate employment and, as we stated, we recovered $144,000 in cash from his home. I didn't state this previously, but there was $100,000 in a storage locker that the government searched pursuant to a search warrant that was connected to Mr. Hartley's wife, and an additional $40,000 in a storage unit searched pursuant to a search warrant that was in the name of Mr. Hartley. So close to $300,000 was recovered from Mr. Hartley. As far as the government's aware, he has no legitimate job.

The government wants to underscore with respect to Ms. Palumbo's role in the conspiracy that this was not a small amount. She is one of the larger-scale individual distributors who was reporting directly to Mr. Hartley and was extending the range of the conspiracy beyond its immediate location in the Bronx and extending it with quite significant quantities in locations outside of the Bronx, in upstate New York.

THE COURT: Beyond the inherent risks that come with heroin and fentanyl, any reason to think, maybe from the cooperator, that members of the conspiracy were aware, including this defendant, of the risk of fatalities?

MR. KROUSE: Your Honor, I can't speak to Ms. Palumbo.

But I can say that the cooperating witness will state, and this is corroborated by extrinsic evidence, that whenever a drug overdose happened and was connected to a stamp the DTO utilized, that DTO on Mr. Hartley's instruction changed its stamp. For instance, there was a drug overdose death on September 11, 2017, using the Obsession stamp, which is a stamp that said "Obsession."

There were six control buys from members of Mr. Hartley's organization where the dealers, who are all named in the indictment, sold the Obsession stamp leading up to that overdose death. So on three dates in August and three dates in September Obsession was sold by members of Mr. Hartley organization, and then a death occurred with that stamp.

even though there were continued control buys from other members of the conspiracy, that Obsession stamp was never purchased again from members of Mr. Hartley's organization. The cooperating witness explains why that is. Mr. Hartley was a very careful drug trafficker. He has a very light criminal history. From what the cooperating witness says, he's been selling large quantities of narcotics since at least 2015.

He knew, Mr. Hartley that is, that drug overdoses had the risk of bringing significant attention and police pressure to his organization, and he would immediately change the stamp once he learned about a fatality or if members of his crew were arrested with significant quantities of that stamp.

At any time, once Mr. Hartley realized that the stamp might be compromised, he would change it. That happened with Obsession. There was another stamp called Fist with a power cord picture. There were control buys of that stamp and a death three days later, and then the stamp wasn't seen again. There were three deaths associated with Hands Up, which was the stamp that the cooperating witness was arrested with.

THE COURT: What did the brand change to after Hands Up?

MR. KROUSE: There have been multiple stamps since then, and some of them are named in the indictment: Sleepless, a stamp called Methadone, a stamp called Peace of Mind. There are various stamps. The organization changes the stamp for reasons other than that just as a marketing employ, but also, based on the cooperating witness's statements and also based on the extrinsic evidence, because of deaths.

THE COURT: There is no proffer at this point that the defendant was aware of the fatalities?

MR. KROUSE: No, your Honor.

THE COURT: Is your argument for detention based on risk of flight and danger to the community or just one?

MR. KROUSE: It's based on both, your Honor.

THE COURT: Why don't you organize your remarks from here as to those.

MR. KROUSE: Yes, your Honor. On both grounds the

government does believe that the danger to the community ground

is a stronger ground for detention, but I will address both.

THE COURT: On the risk of flight, your Honor, the government

believes that the evidence against Ms. Palumbo and most of the

members of the conspiracy is extremely strong, so strong as to

make her conviction very likely on a charge that carries a

mandatory minimum sentence of 10 years in prison. Ms. Palumbo

has two prior felony convictions.

THE COURT: I've got the pretrial services report.

Which are the prior felonies?

MR. KROUSE: Your Honor, she has a May 27, 2009,

felony criminal possession of stolen property in the fourth

degree, credit card. It's on page 5 of the pretrial services

report.

THE COURT: Right. May I see. The F means felony?

MR. KROUSE: Yes, your Honor. Actually, there is

another one close to the same date but it is on a completely

different arrest. On May 4, 2009, criminal possession of

stolen property again, a felony. The defendant also has a

couple of misdemeanor convictions. So this is not a defendant

that has never encountered the criminal justice system. She

does have the felony convictions.

THE COURT: Has she been in jail before? Looks like

she's gotten probation a number of times.

MR. KROUSE: Yes, your Honor.

THE COURT:  Has she been in prison before?

MR. KROUSE:  No, your Honor.  She has received probation.  Based on our review of the criminal record, it doesn't appear that --

THE COURT:  The probation department recites among the reasons that she presents a risk of nonappearance previous probation violation.  I looked at this quickly as I was coming here.  What does that refer to, if you know?  I see that she was re-sentenced on the first offense.

MR. KROUSE:  Yes, your Honor.

THE COURT:  Forgive me.  Mr. Smallman corrects me that it is a pretrial, not a probation department report.  I apologize.  No disrespect intended or affected.

MR. KROUSE:  Your Honor, on page 4 it reflects that on Ms. Palumbo's conviction for criminal mischief, which was a misdemeanor, she was sentenced to 3 years' probation and that her probation was revoked for a technical violation.

THE COURT:  We don't know what that refers to?

MR. KROUSE:  No, your Honor.  It appears that she was then sentenced to prison.  I'll correct my previous statement.  It does appear that she did serve some time.

THE COURT:  That's right.  For those here who can't see the report, it looks like she was then sentenced to 165 days in prison, apparently coincident with the violation.  Maybe defense counsel, when I call on her, will have more

context. Very good.

MR. KROUSE: Then it appears she was re-sentenced to criminal mischief and received a conditional discharge on May 3, 2006. So from January 4th to May 3rd it appears that she was imprisoned for that probation violation.

THE COURT: Keep going with risk of flight.

MR. KROUSE: Your Honor, on the strength of the evidence point, the government believes the evidence is very strong and also that the risk of nonappearance, the strength of the evidence coupled with the mandatory minimum sentence of 10 years would provide Ms. Palumbo with a significant incentive to flee the jurisdiction and not make an appearance in court.

THE COURT: Remind me: in a case like this is the burden still on the government or is this a presumption case?

MR. KROUSE: Your Honor, it is a presumption case. Because this is a controlled substance offense that carries a sentence of more than a maximum of 10 years, there is a presumption that Ms. Palumbo should be detained and that no conditions of release will reasonably assure her appearance or the safety of the community.

THE COURT: What else do you have on risk of nonappearance?

MR. KROUSE: Your Honor, that's it from the government's perspective on risk of nonappearance, the major reason being that the strength of the evidence is very strong.

I65rpalb                                                          22

She is likely to be convicted of a charge that carries a 10-year mandatory minimum, and that would preserve an incentive for her to flee.

THE COURT:  What was the bail package that Judge Lehrburger put in place?

MR. KROUSE:  Judge Lehrburger ordered a $150,000 personal recognizance bond secured by two financially responsible co-signers, pretrial supervision as directed, travel restricted to the Southern, Eastern, and Northern District of New York, that the defendant surrender travel documents and make no new applications.  He also set drug testing as directed by pretrial.  He made Ms. Palumbo's mother her custodian.

The judge also set a curfew of 2:00 a.m.  Ms. Palumbo proffered to the Court that she was going to be starting a job that had hours of 5:00 p.m. to 1:00 a.m., and Judge Lehrburger set a 2:00 a.m. curfew and said that is if she did have the job.  If she didn't have a job, the curfew would be set at 8:00 p.m.

THE COURT:  From the pretrial report, it identifies as a risk of nonappearance self-reported substance abuse history. The report goes on to say that the defendant reported anxiety from a drug addiction and that she pivoted from using pain relief drugs to heroin use and that the mother suspected the daughter was using drugs.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

First of all, I take it we don't have a result of the drug test yet.

MR. KROUSE: No, your Honor. But the government does acknowledge that Ms. Palumbo has reported that she used heroin as recently as 10 hours ago.

THE COURT: One of the questions that arises for everybody to think about is what the implications are for rational decision-making or danger or flight from drug addiction.

MR. KROUSE: Yes, your Honor, the government agrees with that statement by the Court. The defendant has stated that she is addicted to opioids, is addicted to heroin. One reason why she may be making these sales is to support her own addiction. The government doesn't have any independent knowledge of that.

THE COURT: I take it the quantity she is buying is not consistent with personal use.

MR. KROUSE: No, your Honor. It is approximately 800 individual doses per week.

THE COURT: Right. Tell me about the danger to the community.

MR. KROUSE: Your Honor, the danger to the community the government believes is extreme.

THE COURT: Again, a presumption case there. It is your burden still by clear and convincing evidence, but there

is a presumption to start with in your favor?

MR. KROUSE: Yes, clear and convincing evidence. But it is presumed that no conditions can reasonably secure the safety of the community. Here that presumption has not been overcome by the defendant. The defendant was solely responsible for transporting, as far as the government knows, 800 individual dosages of an extremely toxic and dangerous substance, namely, heroin with fentanyl.

THE COURT: Tell me again. 800 doses a week, what would that get you to in terms of an aggregated quantity?

MR. KROUSE: Your Honor, if you took the 800 doses a week and expanded it for the entire year, it would be approximately 40,000 individual doses. A kilogram of heroin is approximately 100,000 individual doses. So we are talking in the neighborhood of 400 grams of heroin or fentanyl. Ms. Palumbo alone distributed that amount of heroin to a reasonably small community.

The fact that Ms. Palumbo has been able to do this for at least a year and a half without being arrested shows that she does have a network to sell to in Elizaville, that she is able to somehow unload 80 packs, 800 individual doses, of heroin in Elizaville or its surrounding area, and that she was able to make these frequent trips and pay cash we believe, based on the cooperating witness's testimony, pay cash to Maurice Hartley, who was the head of the drug-trafficking

organization; pay $2,000 to get 40 packs of heroin, take it back to Elizaville, sell it, and return with a matter of days.

The government believes that that poses extreme danger to Elizaville. We don't believe that any conditions, in particular the conditions ordered by Magistrate Judge Lehrburger, would account for that danger or would address it in any way. Ms. Palumbo would be in the community. She has a curfew of 2:00 a.m. She could sell drugs from her home. She could drive. She could find a new source of supply.

THE COURT: The obvious comeback is what the government has done today may have cut the legs out from the organization. Assuming any stash she may have apart from prior business, what is to assume she is going to be able to get her hands on more?

MR. KROUSE: One obvious rejoinder is that there could be a stash from prior business. The other is that there are other drug-trafficking organizations, unfortunately, and Ms. Palumbo, through her connections, having sold heroin for over a year and a half, may be able to quickly find and obtain another source of supply. She has her ready-made customer base in place. The government's investigation hasn't cut the legs out from under the market for heroin and fentanyl.

THE COURT: Are there members of the organization whom you have heard about who were not arrested today?

MR. KROUSE: Yes, your Honor, there are other members

of the organization that the government did not have sufficient evidence to present to the grand jury and indict. The 17 individuals who have been indicted do not represent the sum total of everyone who we believe is involved in this drug-trafficking organization and is selling quantities of heroin in the drug-trafficking organization's territory.

THE COURT: Thank you very much. Anything else you want to bring to my attention?

MR. KROUSE: No, your Honor. Thank you.

THE COURT: Thank you, Mr. Krouse. Much appreciated.

Ms. Waknine, go ahead. Happy to hear from you.

MS. WAKNINE: Thank you.

THE COURT: To be clear, you are standing in for -- who has been assigned as counsel?

MS. WAKNINE: David Touger.

THE COURT: Thank you for doing that. I take it you are the assigned CJA person today?

MS. WAKNINE: For today. Mr. Touger is going to be assigned CJA counsel. I'm just covering the arraignment today and covering the presentment today.

THE COURT: Thank you for standing in. I appreciate it. Go ahead.

MS. WAKNINE: I want to start off by saying that there have been absolutely no charges brought against Ms. Palumbo connected to any overdose deaths. Also, the government

conceded just now that as part of their investigation they found no overdose deaths linked to any of the stamps found in Elizaville, where my client resides.

The government has presented a lot of serious allegations. I don't have the benefit of any discovery. All I can tell this Court is that my client has pled not guilty. She seriously denies any allegations that she is dealing to 800 users as the government has indicated or implied. She also strongly denies that she played any major role in this conspiracy. It is a 17-person conspiracy. She is the last named person on this indictment.

I also feel that Judge Lehrburger found that the presumption had been rebutted by the fact that this entire organization is now incarcerated. My client certainly does not have the amount of cash --

THE COURT: I take it several people have now been released, right?

MS. WAKNINE: To my knowledge only one person has been released.

THE COURT: The challenge with that argument is that it is an argument that applies to one person in a multi-defendant case. One person gets to make that argument, which is that everyone else is in custody. It's not obvious why Ms. Palumbo gets to be the one as opposed to somebody else in the indictment to make the argument that as long as you leave

everyone else in jail, I have nobody to conspire with.

MS. WAKNINE: I understand, your Honor. Pretrial, however, did recommend that she was a good candidate to be released on bond signed by her parents. She lives currently with her mother and father. Her mothers works at the post office and cleans houses. Her father is a retired police officer. My client is also the caretaker of two young children ages 5 and 2.

THE COURT: Do the children live with the mother and father.

MS. WAKNINE: The children live with my client and the grandparents, my client's mother and father.

THE COURT: Forgive me, but it is a natural point of curiosity: is the father in the picture at all?

MS. WAKNINE: No, your Honor.

THE COURT: If your client were incarcerated, would the parents then be the presumptive caretakers?

MS. WAKNINE: They would have to be for the time being.

THE COURT: How old are the parents?

THE DEFENDANT: Her mother is in her late 60s, her father is almost 70. I also want to point out the government brought out that hundreds of thousands of dollars have been recovered. Certainly not from my client, who works as a --

THE COURT: I didn't hear that.

MS. WAKNINE:  I was saying, your Honor, that the large as sums of money that the government has discussed and recovered were certainly not recovered from my client, who works as a bus aide making $700 a month.  She also was about to begin new employment this week as a home caretaker for an elderly man.  That was why Judge Lehrburger had set the conditions for 2:00 a.m., assuming she is in that line of work.

The allegation about a gun being recovered, again not from my client.  She has no history of violence or violent crime.  She has a small criminal history.  The last arrest was over 10 years ago.  Since that time she has found employment.  She has two young children who whom she cares for.

We believe that the conditions set by the magistrate judge court and recommended by pretrial would be sufficient to ensure my client's return to court.  She has no passport.  She has no money.  She lives with her parents.  She has two little children that she has no intention of leaving behind.  She is absolutely not a flight risk.  She would have nowhere to go and no means to get her there.

With regard to the evidence or the strength of the evidence, it is hard for me to comment without any discovery.  All I can reiterate to this Court is that these are allegations that my client has pled not guilty to.

As far as her being a danger to the community, my client has no history of violence or any history of violent

crime.  She has two young children that she takes care of.

THE COURT:  Let me push back on that for a moment.  I have to take the grand jury's finding as accurate.  I can't look behind that.  Where were the two children and the father, the retired police officer when, as found by the grand jury, she participated in this sustained course of heroin and fentanyl dealing?  Why assume that they are going to keep the conduct in check?

MS. WAKNINE:  I don't know exactly what has been presented to the grand jury.

THE COURT:  What I mean is if the inference is she has two young children and that is a natural self-corrective to bad behavior, the other way to look at this is she is a heroin addict, and that presumably leads a person to a dark place.  That that appears to, more than having a father in former law enforcement or children who might lead a parent to obey the law, led her to do what was alleged.

I've got to treat the allegations that a grand jury has found there to be probable cause of this having been presumptively established, and the government's proffer is consistent with that premise.  I'm pushing back because I think you are entitled to hear what is on my mind.  I'm concerned about the gravity of the offense and skeptical of the theory that these aspects of her personal life will cause her to make law-abiding and rational decisions when, as alleged, they have

not for a year and a half.

MS. WAKNINE: I understand, your Honor. The only thing I can say is that she lives with her parents. One is a retired police officer. They are very supportive and they are willing to help. She also has the support of a sister, who lives nearby and who also she is very close to.

THE COURT: Is her sister in position to help with the children?

MS. WAKNINE: I'm not sure, your Honor. I don't know what the sister's work schedule is or whether or not she would be able to help.

THE COURT: May I ask you about the heroin addiction. The pretrial services report states that Ms. Palumbo acknowledges her heroin addiction. Is that in fact correct?

MS. WAKNINE: Yes, your Honor. I was going to say as far as she has a drug addiction that has affected her behavior, she has already indicated to me the only thing she wants to do is receive help. Part of the conditions set by the magistrate court were to comply with drug testing and/or drug treatment. My client would be more than willing to take advantage of that treatment.

Also, as far as any danger she would pose to the community, there is the option of house arrest. If it would make the Court feel more comfortable that she was confined to her home and in the presence of her parents, one being a

retired police officer, we would submit to that.

Also, one of the conditions set was that her mother would serve as a third-party custodian. Her mother has indicated that she is very supportive of her daughter and willing to help her out and play whatever role the Court would like her to play. Her mother is also on her way down here as we speak, with her sister.

I would point out that based off of the information the government provided to the Court just now, based on their own cooperating witness, there is no evidence that my client was aware of any deaths related to overdose. It boils down to a 45-day surveillance where they say twice a week, they say four to six times they have seen her.

I would again remind the Court that although a lot of serious allegations have been presented to the Court, there are 17 defendants in this case. I don't know that all the allegations the government made would apply to my client.

THE COURT: Anything further?

MS. WAKNINE: No, your Honor.

THE COURT: Let me hear from pretrial. There is no need for you to share your views, but if there is anything you want to add or if you have reassessed, I'm happy to hear what those views are. If any of you want to speak, preface it with your name.

MR. ROTHMAN: Josh Rothman from pretrial. We would

stand by our recommendation that was in our report based on the information that has been provided and the bail that was set previously.

THE COURT: Can I ask you a question?

MR. ROTHMAN: Sure.

THE COURT: Were you aware in making the recommendation of the allegation that two or three times a week she, a heroin addict, is driving two and a half hours to and from New York and she has a prior driving while intoxicated conviction? It's a 2004 operating a motor vehicle impaired by drugs. Did you assess that in thinking about danger to the community?

Putting aside the people who get hurt from selling drugs, everyone on the Thruway is in danger in that situation. How do you sort that out? I'm sorry to put you to it, but you, like me, are a custodian of the community here. I'm putting together the driving at great length with the heroin addiction and the prior and trying to figure out how to square that.

MR. ROTHMAN: I certainly understand the Court's concern.

THE COURT: If you were a commuter, I think you would really understand it. My goodness, that person next to you on the Thruway could be Ms. Palumbo.

MR. ROTHMAN: That could be said for any commuter on the Thruway. Unfortunately, we are in a position where we

could make that one person safer. That being said, I'm not the officer who made the recommendation and I'm not familiar with what was discussed when the recommendation was made, but I do stand by the recommendation.

THE COURT: Thank you.

I am going to take a few minutes and confer with my staff. I'll be out in five minutes.

MR. KROUSE: Your Honor, I'm sorry to interrupt, but just to address one argument made by defense counsel. The government will also proffer that during each of the instances when Ms. Palumbo was observed by physical surveillance making the trip from Elizaville to obtain heroin from Mr. Hartley, she was in the vehicle with her two children. I wanted to address that because defense counsel relies heavily on the fact that Ms. Palumbo is a mother. The government would submit that the danger to the community would also include her children, who are placed in that very dangerous situation.

THE COURT: Thank you. I'm glad you clarified that. I'll see you in five minutes.

(Recess)

THE COURT: I want to begin by first of all thanking all counsel here. This hearing was very hastily convened, and yet I feel like I have received a very full presentation from both sides and I have a rather good understanding of at this early stage what the relevant facts are. I want to thank the

government for an orderly and comprehensive and helpful presentation. And the defense, Ms. Waknine, particularly because you're pinch hitting but also appreciate the vigor of your advocacy and your passion.

I am going to address danger to the community. The governing standard here requires the Court to find danger to the community by clear and convincing evidence. Mr. Krouse is correct that given the charge in this case, there is a presumption that the defendant is a danger to the community. With or without the presumption, I would find and do find that the defendant is a danger to the community, and I find that by clear and convincing evidence. Very briefly, here is why.

To begin with, the conduct in this case is extra-ordinarily dangerous. Within the four corners of the scheme, the defendant, as alleged, two to three times a week traveled to New York in order to distribute substantial distribution quantities of a pair of drugs, heroin and fentanyl, which themselves carry inherently a danger to the community. It happens to be all the more so because of apparently the toxic means by which the pair of drugs were put together in this case.

Even if this was garden-variety drug dealing, the sheer quantity presents an obvious danger to the community. With 800 individual doses, as alleged, having been brought to the defendant's home town on a, say, twice a week basis, if I

have the math right, once a week, 800 in total over the course of a week, that is potentially a lot of doses of dangerous addictive drugs.

Heaven knows, if anyone appreciated the addictive quality of those drugs, it would be Ms. Palumbo.  But there is an inherent danger just within the four corners of participating in a drug-trafficking organization like this.  It is even worse given what has been proffered to me about the toxicity of the drugs here.

There are collateral ways, though, in which there is a danger presented by this offense.  The defendant twice a week traveled two to two and a half hours from upstate New York to New York City making, averaging those assessments, about nine hours of travel time a week.

That would be all fine and good if the defendant weren't a heroin addict.  The prospect of the defendant or the position of the defendant driving all that time while addicted to heroin to pick up drugs in order to presumably engage in drug-trafficking sales that support the habit creates an obvious concern about a whole other level of danger which involves driving while being a heroin addict.

I would note that this is not a new phenomenon.  The defendant has a substantial list of prior arrests or convictions, a charge of operating a motor vehicle while impaired by drugs in 2004.  The defendant was sentenced at the

time to pay a fine. That evidently didn't get her attention.

The additional fact that Mr. Krouse references the fact that there were two little kids in the car makes the crime all the more alarming. By definition, the lead defendant in this case was getting into a car with two kids in it to hand over heroin and fentanyl, and the defendant, a heroin addict, was then getting in the car and driving it several hours.

The overall portrait certainly suggests a complete reckless disregard for public safety both in the context of the people to whom the drugs were being sold, the other people on the freeway, and her own children.

The issue for the Court, of course, is whether or not the fact of the arrest and the conditions that might be attached to the defendant's release eliminates the danger to the community. I find that it does not. To begin with, the overall pattern here is so reckless and reflects such dreadful judgment that I am by no means confident that the defendant after the arrest and if at home would be making better decisions.

There is every possibility that there is leftover drugs left in the house from one of these biweekly visits. There is by inference a purchaser base to whom these 800 doses were being transferred. It may only be a few people who were buying it, maybe it is just one local purchaser, but there are drug connections up in or around the Elizaville area. It

logically follows.

While none of us can know what the details are, those are elements that could easily lead to a regeneration of some form of drug activity. All that is all the more likely if the defendant is, as acknowledged, in the grip of a drug addiction. So I do not have confidence, notwithstanding the take-down of this organization, that the defendant would not engage in continued narcotics activity, particularly if necessary to support what appears to be a potent habit.

Beyond that, I would note that there is a long criminal history here and a relatively diverse one at that. That gives me additional concern here that the defendant, having not been deterred by the prior offenses here, will necessarily be deterred by this arrest.

To review the bidding, in 2002 the defendant was arrested by the Hudson city police for criminal mischief, was convicted upon a plea of guilty, and sentenced to probation for 3 years. Page 4 of the pretrial services report indicates that the probation was revoked for some unspecified form of violation that resulted in the defendant spending 5½ months, 165 days, in prison. A reasonable inference is that that was not a ticky-tack or irrelevancy but something was troubling enough to the judge there to put the defendant in prison for that. That alone should have been a wake-up call not to commit other offenses.

Later in the same year, the defendant is arrested for the operation of a motor vehicle while impaired by drugs. There is a reference at the same point in the rap sheet to the unlawful possession of marijuana. The defendant pled guilty to the marijuana offense and to the driving while impaired offense and was sentenced to a fine. That clearly did not deter her.

In 2008 the defendant committed an economic offense, criminal possession of stolen property, possession of a credit card. She was convicted upon a plea of guilty and was sentenced to probation for 5 years.

In 2008 the defendant was arrested for the crime of identity theft. There is no disposition report.

In 2009 the defendant was arrested and charged with criminal possession of stolen property, was convicted on a plea of guilty to that offense, and was sentenced again to probation, 5 years.

There is a pattern here. The pattern here is of a series of offenses -- two felonies, others not -- that continued to eat into the defendant's 20s. I can't look behind the veil and know what the motivations were. One very plausible explanation for this, though, is that there was a need for money consistent with an addiction habit that needed to be fed. That problem has not been redressed, and I cannot assume that it will go away just because the defendant now, having been federally arrested, professes an interest in

getting better.

The defendant's mother apparently perceived the problem but was unable to stop it. The defendant's father, a police officer in the home, was unable to do anything about it. The defendant had the two ultimate deterrents, two little children in the house, and that didn't stop it. I can't be confident that this other change in circumstance will lead the defendant to make law-abiding choices.

In the end, putting all of this together, while I can't know the particular form in which the danger may manifest, whether it is continued drug dealing, some other form of economic crime, or just the irrational behavior of getting into a car and driving while high on drugs, there is a range of reckless, dangerous conduct that the assembled record reflects hasn't been deterred and which I have an obligation to protect the public against.

So I find -- without any real hesitation, to be very honest, because I don't find this to be a close case -- that the defendant is a danger to the community, and I find that by clear and convincing evidence.

In light of that, I have no occasion to reach the separate issue of risk of flight, and I'm not going to reach it.

That is my ruling. Obviously this case is on its first day and I'm mindful, defense counsel, that as the case

moves forward and the defense gets a handle on the rule 16 material, and as this defendant's circumstances change and as drug treatment may begin where the defendant may then again to get clean in the context of being in pretrial custody, the overall circumstances may look different and may become different.

I'm happy to revisit this conclusion as the assembled circumstances take more shape. So please do not consider this a final determination, but it is my best assessment based on the evidence at hand. That is my ruling. I am going to sign this order now.

MS. WAKNINE: Thank you, your Honor. I have one request. If my client is to be remanded, we would request that she receive medical attention. She has suffered from withdrawal symptoms. If she is going to be incarcerated, we would like to ask that she receive medical attention when she gets there.

THE COURT: I will be happy to make that notation. Give me one moment. I will solicit from you in a minute the particular formulation.

On the form that I have just signed that provides for the defendant's detention, there is a separate provision about additional comments. May I be as explicit as to say the defendant has a drug addiction and requires medical attention? It seems to me that if I'm going to say medical attention, I

might as well not mess around with what the specifics are.

MS. WAKNINE:  Yes, your Honor.

THE COURT:  Thank you.  We stand adjourned.

(Adjourned)