LAW OFFICES OF

# STEPHEN TURANO

———

sturano@turanolaw.com

275 MADISON AVENUE
35TH FLOOR
NEW YORK, NY 10016

60 PARK PLACE
SUITE 703
NEWARK, NJ 07102

———

TEL (917) 974-1781
FAX (212) 208-2981

TEL (973) 648-6777
FAX (212) 208-2981

———

REPLY TO NEW JERSEY OFFICE

August 29, 2019

**<u>Via ECF</u>**
Hon. Paul A. Engelmayer, U.S.D.J.
Thurgood Marshall U.S. Courthouse
Courtroom 1305
40 Foley Square
New York, NY 10007

   Re: <u>United States v. Tia Jasper</u>,
      18 Cr. 390

Dear Judge Engelmayer:

  This firm represents Tia Jasper ("Tia") on the above-referenced matter. We submit this letter for the Court's consideration in connection with Tia's sentencing, which is scheduled for September 12, 2019.  For the reasons set forth below, we respectfully request that the Court impose a noncustodial sentence.

  We make this request understanding that a straightforward application of the United States Sentencing Guidelines ("Guidelines") and the plea agreement between the parties suggest a custodial sentence, but believing that an examination of the relevant factors under 18 U.S.C. § 3553 justifies the noncustodial sentence sought.

1

Tia pled guilty to a serious crime and takes full responsibility for her actions.  None of the mitigation arguments contained in this submission is intended to excuse her conduct or to avoid acceptance of responsibility.  Given, however, her life and family circumstances, role in the overall conspiracy, medical issues, and complete lack of a criminal history, the defense respectfully requests that the Court impose a noncustodial sentence.

**Background**

As the Court is aware, this case arose from a multi-defendant conspiracy investigated by federal and local law enforcement regarding a drug-trafficking organization in the Bronx, New York, led by Tia's long-time companion and father of her children, Maurice Hartley ("Hartley").

On June 4, 2018, a federal grand jury returned an indictment charging 17 defendants, including Hartley, with conspiring to distribute and possess with intent to distribute mixtures containing fentanyl and heroin.  Tia was not charged or otherwise referred to in the indictment.

Incident to the arrest of these defendants, a Southern District of New York magistrate judge issued search warrants for locations associated with the drug-trafficking organization, including the residence Hartley shared with Tia and their two children.  On June 5, 2018, after the 17 defendants were arrested, law enforcement searched the Hartley residence and the other locations.  At Hartley's residence, law-enforcement agents recovered a large sum of money and a bag containing 2.5 kilograms of heroin.  Regrettably, during the search Tia attempted to hide the bag containing the drugs under a bedsheet.  As a result, Tia was detained and questioned by law enforcement, during which she stated: (1) she was aware that Hartley distributed drugs; (2)  on "two to three" occasions and at Hartley's direction she handed a package containing narcotics to a "white girl" (identified as Marie Palumbo "Palumbo");  and (3) on several other occasions, again at Hartley's direction, she provided an envelope to Palumbo containing money.  *See*

2

Attached as Exhibit A, the New York Police Department Investigation Report detailing Tia's June 5, 2018 interview with law-enforcement officers. In addition to agreeing to speak with law enforcement officers, Tia provided her consent to search a storage unit and subsequently directed the officers to the storage unit. The unit contained approximately $100,000 of Hartley's drug proceeds. *See* Attached as Exhibit B, the FBI Consent to Search form dated June 5, 2018.

Tia was arrested and subsequently charged in a separate one-count indictment. She was eventually added to the main indictment and on December 19, 2018, all of the remaining defendants were included in a superseding indictment. Tia pled guilty to Count One. Although Count One charges a conspiracy to distribute and possess with intent to distribute 400 grams or more of a mixture containing detectable amount of fentanyl and one kilogram or more of heroin in violation of 21 U.S.C. § 841(b)(1)(A), Tia pled only to the lesser-included conspiracy in violation of 21 U.S.C. § 841(b)(1)(C).

The plea agreement entered into between Tia and the Government provides a base level of 32 (U.S.S.G. §§ 2D1.1(a)(5) and 2D1.1(c)(4)). *See* Plea Agreement dated December 5, 2019 ("Plea Agreement") at 2. The Plea Agreement also provides for a five-point reduction based on Tia's minor role in the conspiracy (U.S.S.G. §§ 3B1.2 and 2D1.1(a)(5)). *Id.* Probation credits Tia with acceptance of responsibility, resulting in a total offense level of 24. *See* Presentence Investigation Report ("PSR") at ¶¶ 4 and 36-46. In addition, the Plea Agreement permits defense counsel to seek a downward departure under 18 U.S.C. § 3553(a) factors, which are addressed herein. *See* Plea Agreement at 3. At a criminal history category I, Tia's applicable Guideline's range is 51-63 months. *Id.*; PSR at ¶¶ 4 and 47-53.

**<u>Legal Standard</u>**

As the Court is well aware, the United States Sentencing Guidelines are not binding, pursuant to *United States v. Booker*, 125 S.Ct. 738, 2005 WL 50108 (Jan. 12, 2005). While the Court is nevertheless bound to "consider" them in fashioning an appropriate sentence, *see United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), they do not incorporate all of the sentencing purposes or factors set forth in 18 U.S.C. § 3553(a). The United States Sentencing Commission itself acknowledged, when first promulgating the Guidelines, that it was impossible to devise a guidelines system that captures and accounts for "the vast range of human conduct potentially relevant to a sentencing decision." U.S.S.G. ch.1, pt. A(4)(b)(1987).

There is no legal presumption that a sentence within the applicable Sentencing Guidelines range is *per se* reasonable. Rather, the Supreme Court made clear that, after determining the applicable Guidelines range, the sentencing court must "consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a)." *Nelson v. United States*, 555 U.S. 350, 351 (2009).  Those factors include: the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense and to afford adequate deterrence, the kinds of sentences available, the need to avoid unwanted sentencing disparities, and the applicable Guidelines range. 18 U.S.C. § 3553(a)(1)-(7).

We also respectfully submit that a consideration of statutory directives in 18 U.S.C. § 3553 and those factors listed in U.S.S.G. § 5H1 provides further support for the imposition of the sentence urged here. The Supreme Court's holding in *Booker*, 543 U.S. at 245-46, requires sentencing courts to consider, in addition to the Guidelines themselves, the broad directives set

forth in 18 U.S.C § 3553(a).[1] *See also United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006). In

fact, "the overarching command of" § 3553(a) requires courts to "impose a sentence sufficient,

but not greater than necessary to accomplish the goals of sentencing." *United States v. Davis*,

No. 07 Cr. 727 (HB), 2008 WL 2329290, at *4 (S.D.N.Y. June 5, 2008) (citation omitted)

(emphasis added); 18 U.S.C. §3553. *See also United States v. Johnson*, 964 F.2d 124, 125 (2d

Cir. 1992) (Guidelines "do not require a judge to leave compassion and common sense at the

door to the courtroom"). Section 3553(a)(2) states such purposes are to:

(A)     reflect the seriousness of the offense, to promote respect for the
        law, and to provide just punishment for the offense;

(B)     afford adequate deterrence to criminal conduct;

(C)     protect the public from further crimes of the defendant; and

(D)     provide the defendant with the needed educational or
        vocational training, medical care, or other correctional treatment
        in the most effective manner.

The Supreme Court has continued to clarify the relative weight sentencing courts should

afford the Guidelines. *Gall v. U.S.*, 552 U.S. 38, 49 (2007); *Rita v. U.S.*, 127 S.Ct. 2456, 2465

(2007). Specifically, in *Rita*, the Supreme Court stated that "the sentencing court does not enjoy

the benefit of a legal presumption that the Guidelines should apply." 127 S.Ct. at 2465 (2007)

(citing *Booker*, 543 U.S., at 259-260). Then, in *Gall*, the Court rejected a standard of review that

would require the strength of the underlying justification for a departure from the Guidelines to

---

[1] The Supreme Court's holding in *Booker* also permits this Court to consider those factors
listed in U.S.S.G. § 5H1, including those very much applicable here: education and
vocational skills (U.S.S.G. § 5H1.2), mental and emotional condition (U.S.S.G. § 5H1.3),
family ties and responsibilities (U.S.S.G. § 5H1.6), socioeconomic status (U.S.S.G. §
5H1.10), lack of guidance as a youth and similar circumstances indicating a
disadvantaged upbringing (U.S.S.G. § 5H1.12), and duress relating to "personal financial
difficulties and economic pressures upon a trade or business" (U.S.S.G. § 5K2.12).

be "proportional" to the degree of the departure and confirmed that the abuse of discretion standard applies to sentences both within and outside the Guidelines. *Gall*, 552 U.S. at 49. In arriving at this decision, the Court also rebuffed any notion that sentences outside the Guidelines required extraordinary circumstances. *Id.* Based upon these developments, we submit that the Guidelines carry no greater weight than the other sentencing factors under 18 U.S.C. §3553 or U.S.S.G. § 5H1.

In sum, a court must impose a lesser sentence if it is sufficient to comply with Section 3553(a)'s sentencing purpose. *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010). Specifically, a sentencing court must fashion a sentence that is "sufficient, but not greater than necessary" to achieve the goals of punishment, deterrence, and rehabilitation. *Kimbrough v. United States*, 522 U.S. 85, 101 (2007) (*quoting* 18 U.S.C. § 3553(a)).

### **Arguments in Favor of a Noncustodial Sentence**

This offense marks the first time Tia has been accused of a crime and the stigma and shame associated with her involvement, albeit a minor role, in Hartley's drug-trafficking organization has taken a significant toll on her and her children. The defense submits that Tia's involvement in this crime was a considerable detour from her otherwise law-abiding life. She has no criminal past and her conduct for the vast majority of her life and since her arrest suggests that Tia does not pose a risk of recidivism. Again, fully accepting responsibility for her own actions, the defense submits Tia's isolated illegal acts were predicated by her relationship with Hartley and she would not have been involved in any crimes had she not been his paramour and had he not directed her to make the deliveries to Palumbo.

1. <u>Tia's Background, Character and the Nature and Circumstances of the Offense Warrant Leniency</u>[2]

Tia's background, true character, and personal circumstances warrant a noncustodial sentence. *See* 18 U.S.C. § 3553(a)(1) & (2)(c) (instructing courts to consider "the history and characteristics of the defendant" and the need "to protect the public from further crimes of the defendant"). *See*, *e.g*., *United States v. Johnson*, 964 F.2d at 128 (family circumstances justify departure).

a. Tia Overcame Difficulties During Childhood

Tia was born in Harlem, New York on July 17, 1981. She is the only child produced by the union of Valena Jasper and Blannon Craig. Tia was raised by her paternal grandmother, Brenda Craig, who took custody of Tia almost immediately after her birth because her parents turned to drugs, alcohol, and crime.[3] According to Ms. Craig, Tia's mother struggled with drug and alcohol addiction her whole life and Tia's father got involved in drug sales and other crimes as a young man and spent significant periods of time during Tia's childhood in prison. As a result, Tia had very little contact with her parents growing up. Since the birth of her own children, Tia has made it a priority to maintain a relationship with her parents for the benefit of providing her own children with grandparents.

Tia describes her grandmother as "warm," "generous," and "kind." She has an obvious appreciation and respect for her grandmother and is thankful for the fact that Ms. Craig has

---

[2] The information contained in this sentencing memorandum was obtained largely from a review of the criminal discovery, Tia's medical records, records from the proceeding in Bronx Family Court, conversations with Martha Liskow, Tia's Bronx Family Court attorney, and interviews of Tia's family and closest friends conducted by mitigation specialist Nancy Tricamo.

[3] Tia's paternal grandfather, Brenda's husband, Blannon Craig, Sr., passed away when Tia was just thirteen.

always been available when Tia most needed support. In fact. Ms. Craig remains a valuable

support system for Tia. But, despite Ms. Craig's best and admirable efforts, for most of her early

childhood Tia lived in the St. Nicholas Public Housing Project in Central Harlem. These

projects have an infamous history of violence, mostly related to the heroin drug trade in the

neighborhood.[4]

Crime has run rampant throughout this community for decades. Heroin dealing began in

this community in the early 1970's and has remained a significant and dangerous presence in

Central Harlem since that time. *Id*. Tia eventually move to the Marble Hill projects in the Bronx

where the crime rates were lower.

What makes Tia's involvement in this case even more regrettable is that she had spent the

vast majority of her life breaking the cycle of drug addiction and crime that plagued her parents'

lives and her community. Since her arrest, however, Tia has pledged to maintain a law-abiding

lifestyle, be a positive role model for her children and community, and keep her children safe

from the drugs, crime, and violence she was exposed to during her childhood. She recognizes

the great harm she has caused her children (and the community) and is committed to making up

for her poor decisions to get involved in this conspiracy

b. Tia's Complicated Relationship With Hartley

Unlike many of the relationships the Court is confronted with when sentencing

codefendants who are romantically involved and who have different culpability in a conspiracy,

this one is not marred by drug abuse or domestic violence. In fact, Tia talks about the loving

relationship she and Hartley share. However, this relationship is one with great contradiction.

---

[4] https://unitedgangs.com/2017/12/08/the-10-most-dangerous-housing-projects-in-manhattan-new-york/

On one hand, they were a prototypical family who cared very deeply about their children and one another. Tia was active in her children's lives (*i.e.*, PTA president) and worked a regular job. On the other hand, Hartley led a drug-trafficking organization. Hartley did not threaten violence when he asked Tia to make those deliveries to Palumbo, but the care and admiration she otherwise held for Hartley no doubt led to her decision to agree to perform those acts. On a greater level, her love for Hartley and visions of a bright future for her children caused her to turn a blind eye to the blight Hartley's organization had on the community.

Tia and Hartley met when she was twenty through a mutual friend and they began dating almost immediately. Tia had not had many romantic relationships before and was appreciative of Hartley's affections. When they first met, Tia described Hartley as kind, quiet, and family focused. He came from a dysfunctional family and after dating for some time, the two of them decided together that, unlike their own childhood experiences, they wanted to raise their children in a strong, cohesive, and loving family unit.

Tia and Hartley have been together for seventeen years. In 2007, when Tia was twenty-five, Maurice Kareem Hartley, Jr., ("Maurice Jr.") was born. About eighteen months later the couple welcomed their daughter, Taniya Madison Hartley ("Taniya").

c. Tia's Role as Primary Caregiver and Devoted Mother

Tia strived to create normal and happy childhoods for her children. She understood what it was like to have absent parents and vowed never to have her children experience what she did. Tia is completely appreciative of her grandmother's love and care but did not have the "traditional" experience of being raised by either parent.

By all accounts, Tia is a committed parent and her children are well cared for. Maurice is in the sixth grade and performs well academically. He is also involved in many extracurricular

activities, including playing the cello and is the captain of his school basketball team.  Evidenced by his participation on an Amateur Athletic Union ("AAU") team, the NY Gauchos, Maurice shows great promise as a scholar athlete.[5]   The pride Tia has for her son and his accomplishments is obvious to all anyone who has heard her speak about him.

Tia is equally as proud of Taniya.  She describes Taniya, a fifth grader, as a well-rounded and accomplished student.  Taniya is involved in her school chorus and plays the violin in her school orchestra.  She has received awards for her involvement in both of these activities as well as having perfect attendance for the 2019 academic year (no small feat given Tia's work schedule and the ongoing Bronx Family-Court proceedings), and an award for excellence in science.  *See* Attached as Exhibit C, Maurice Jr. and Taniya's scholastic awards.

Despite their parents' legal troubles, Taniya and Maurice Jr. continue to flourish in school because Tia has made a concerted effort to prioritize them and their education.  Everyone interviewed for this submission spoke about Tia's dedication to her children and her being an excellent, involved mother.  Tia won awards for being the "Greatest Guardian" at her daughter's school as well as awards of appreciation for her involvement in the school community.  *See* Attached as Exhibit D, Tia's" "Greatest Guardian" awards.

Ms. Brenda Craig also wrote about Tia's parenting ability, stating she is "always with her children," "goes above and beyond to take care of them," is "involved in their daily lives," and "invests all of herself into her role as a mother."  *See* Attached as Exhibit E, character letters

---

[5] According to its literature, the New York Gauchos ("Gauchos") AAU basketball program "offers youth in New York City the highest quality athletic programming, academic support and enrichment."  Operating as a 501(c)3 nonprofit located in the Mott Haven section of the Bronx, the Gauchos is "one of the longest-running and most successful after-school basketball programs in the country," offering four competitive divisions for boys and girls. *See* https://www.newyorkgauchos.org/about/

submitted in support of Tia's noncustodial sentence. Ms. Craig also spoke about how "obvious" and "strong" the attachment Tia's children have with their mother, and how "devastating" it is to consider that it might be severed.

Included in this submission are letters from family and friends detailing Tia's good character. *See* Exhibit E. What are most striking, however, are the letters of support from school employees and parents of classmates. These letters detail how caring and dedicated Tia is to not only her own children, but the entire student body. Glenn Caroccio, the assistant principal at P.S. 91x acknowledges Tia's "great contributions" to the school. Shana Parker, an educational assistant at P.S. 91x wrote that "Tia has done more for the children in and around P.S. 91x than any other person or organization. . . . She's an amazing addition to the community and I am glad to have met her." And Michele Evans, a teacher at the school observed that Tia is tirelessly giving of herself, not only to her children, but to others as well. . . . She is always ready and willing to assist the school to ensure that her children and others receive the best possible educational experience that leads to them being successful." Ms. Evans went on to state that, while she was "troubled" by Tia's criminal involvement, since her arrest, Tia expressed a "strong desire and determination to learn from her experience and move in a positive direction with her life so that she can continue to make sure her children are successful in their education and life."

Tia has been the class parent for both of her children's classes, has been president of the Parent Teacher Association, and is always volunteering to help at the school in whatever way she can. One parent of a classmate wrote:

> [Tia] is loved by students and faculty alike. She is never hesitant to lend a helping hand if needed. For example, she often chaperone [sic] trips, cooks for a potluck, helps orchestrate concert and encourages the kids to do their best. She always look [sic] out for the kids that need an extra bit of attention. I have witnessed her buying lunch for a child who did not have lunch for a trip, just because that is the

kind of person she is. I can truly and honestly say she is generous and kind-hearted.

In arriving at a sentence, the Court should consider the positive impact Tia has had on her family and school community (*see United States v. Davis*, 2008 WL 2329290, at *1, 5 (S.D.N.Y. June 5, 2018)) (granting below-Guideline sentence based largely on the "significant positive impact" defendant had on family).

### d. Tia's Work History

Unlike most of her codefendants, Tia was not regularly or actively involved in the drug trade. Aside from the few exchanges she had with Palumbo, and despite her medical issues (described below), Tia maintained regular employment. Although Hartley was a drug dealer, Tia, in an effort to live a law-abiding life, chose to work and has a lengthy employment history. Most notably, from 2003 to 2015, Tia worked year-round for Legends, the concession operator who runs all of the events staged at Yankee Stadium. She left that job because the irregular and often late-night hours were not conducive to her child-care responsibilities and volunteer work performed at her children's school. Also, since her arrest, Tia has maintained continuous employment as a cashier at a Dollar Tree store in the Bronx.

She hopes to return to school one day and receive a teaching degree. Despite this conviction, Tia still dreams of working in some capacity in an elementary school.

### e. Hartley's Control Over Tia

Tia recounts a long relationship with Hartley devoid of physical and emotional abuse. He did not threaten or otherwise force Tia to make the deliveries to Palumbo. Nonetheless, because of her love for and devotion to Hartley she agreed to follow his instructions.[6] At the time, Tia

---

[6] In accessing culpability, the PSR states that "the Government believes [Tia's] conduct was less serious and part of her conduct was motivated by a familial relationship." *See* PSR at ¶ 30.

12

did not fully appreciate how her actions helped facilitate the ends of a dangerous drug-trafficking organization. She now understands the scope and extent of Hartley's organization, fully comprehends the wrongfulness of her actions, and deeply regrets them.

### f. Tia's Chronic and Serious Health Condition

Tia first experienced stomach issues at age 14. Ms. Craig reports that Tia had little appetite, experienced significant weight loss, anemia, and complained of constant stomach upset. About a year later, Tia was diagnosed with Crohn's disease.[7] *See* Attached as F, Tia's medical records supporting the Crohn's disease diagnosis.

Tia had resection surgery when she was 16 years old to remove parts of her lower intestines and diseased bowel to help lessen her symptoms. She continues to be closely monitored by a gastroenterologist every three months and receives a colonoscopy every six months to make sure her condition does not worsen.

A defendant's medical history is something a Court must factor when determining an appropriate sentence.[8] Tia's chronic medical condition, Crohn's disease, has required close

---

[7] According to the Mayo Clinic's website:
> [C]rohn's disease is an inflammatory bowel disease. It causes inflammation of your digestive tract, which can lead to abdominal pain, severe diarrhea, fatigue, weight loss and malnutrition. Inflammation caused by Crohn's disease can involve different areas of the digestive tract in different people. The inflammation caused by Crohn's disease often spreads deep into the layers of affected bowel tissue. Crohn's disease can be both painful and debilitating, and sometimes may lead to life-threatening complications. While there's no known cure for Crohn's disease, therapies can greatly reduce its signs and symptoms and even bring about long-term remission. With treatment, many people with Crohn's disease are able to function well

*See* https://www.mayoclinic.org/diseases-conditions/crohns-disease/symptoms-causes/syc-20353304

[8] In the Notre Dame Journal of International and Comparative Law, the author discussed the sentencing regulation as it relates to medical conditions:

monitoring by her gastroenterologist for twenty years. She is currently treated for her Crohn's

disease by Garrett Lawlor, MD, of the Columbia University, Department of Medicine. On June

12, 2019, Dr. Lawlor, through his nurse practitioner, Rachel Drolet, NP, advised defense counsel

that Tia's Crohn's disease is "severe" and chronic. *See* Attached as Exhibit G, Dr. Lawlor's (by

Rachel Drolet, N.P.) report. The report cautions that Crohn's disease can lead to "severe

symptoms that are at times debilitating and exacerbated by stress." *Id.* Currently, Dr. Lawlor

scheduled Tia for diagnostic studies and he believes that her current treatment is insufficient. Dr.

Lawlor advises:

> [Tia] should continue to avoid long workdays and heavy workloads. She may
> ultimately benefit from short-term disability, but in the immediate, I recommend
> that she request modified work schedule to allow for daily at-home treatments and
> more frequent office visits, as we attempt to manage her pain and risk for
> infection during treatment adjustments.

*Id.*

---

Thus, in spite of Congress's directive that imprisonment is not an appropriate means of promoting correction and rehabilitation, the vast majority of federal criminal defendants serve their sentences in federal prison—away from their families and community service providers—and without meaningful access to needed medical care, rehabilitation, and other treatment. Given the BOP's challenges to providing treatment in an effective, let alone adequate manner, the courts should be taking § 3553(a)(2)(D)'s statutory command much more seriously in deciding whether imprisonment is an appropriate sentence.

The BOP faces numerous challenges in providing adequate, let alone effective, medical care to inmates. A 2016 report from the Office of the Inspector General highlighted staffing shortages as one of the biggest problems: "[R]ecruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care, result[ing] in an increased need to send inmates outside the institution for medical care, and [contributing] to increases in medical costs." The BOP's structure for providing medical treatment to inmates poses challenges for delivering the "most effective" care to all inmates.[8]

Clearly, prison is not an ideal setting in which to monitor and treat Tia's Crohn's disease. The defense, however, acknowledges that defendants are routinely sentenced to the custody of the Federal Bureau of Prisons ("BOP") with conditions even more debilitating and life threatening than Crohn's disease. To be clear, it is unknown whether Tia will receive adequate medical care for her Crohn's disease if she is sentenced to BOP custody. But it is extremely likely that the quality of care will be less than she now receives at Columbia University's Department of Medicine. And, according to her treating physician's office, disrupting her medical treatment could cause Tia significant harm. *See* Exhibit G.

g.  Extraordinary Impact Incarceration Will Have on Tia's Children

The Administration for Children's Services ("ACS") filed a neglect petition against Tia in Bronx Family Court (called an Article X proceeding) because drugs were found in the residence when Tia was arrested.  As a result, Maurice Jr. and Taniya were removed from Tia's primary care and placed in kinship care.[9]  Throughout the Article X proceedings, Tia maintained consistent visitations with her children.  In fact, as the Court is well aware from the numerous requests to modify the conditions of Tia's pretrial release,[10] Tia has made it her priority to spend as much time as possible with her children—both because maintaining normalcy of contact with the children was in their best interest and because her children are Tia's greatest joy.

Tia has been fully compliant with all Bronx Family Court orders and ACS recommended services, which included a mental-health evaluation, weekly individual therapy sessions at New

---

[9] The children were temporarily placed with their paternal aunt.

[10] Since her release on Pretrial Supervision on June 8, 2018, Tia, through counsel, frequently requested that the Court modify her release conditions.  All of these requests, including her requests to join her extended family for yearly vacations in Wildwood, were made in an effort to maintain consistent contact with the children or to comply with ACS recommended services.

York Psychotherapy Counseling Center, completing parenting skills courses (called "Parenting Through Change"), and random drug screenings (Tia never tested positive).

Given Tia's devotion to her children and continued, steadfast compliance with the ACS service plan, her visitation rights steadily expanded over the course of the ACS case. Tia was granted supervised visitations soon after the proceedings were initiated and soon after that, supervised, overnight visitations. In December 2018, Tia began unsupervised overnights visitation. In June 2019, after a discharge conference, the Family Court ordered that the children be "trial discharged" to Tia—meaning the children live with her exclusively, without any kinship supervision. This remains in effect. This rapid progression was due to Tia's contrition and considerable efforts to reunite her family.

According to Martha Liskow, from Bronx Defenders, Tia's attorney in the Family Court proceedings, opined:

> Prior to this case, both of [Tia's] children were thriving in her care. . . [The children] have expressed, through their [court-appointed lawyer] a desire to return home to their mom. This desire has been unwavering since the onset of this case over one year ago and [Tia] has done everything in her power to make reunification possible. I ask you to consider her consistent engagement in services, compliance with [Bronx Family Court] orders, and strong bond with her children as you consider [Tia's] sentence.

Ryan Koleda, the attorney appointed by the Bronx Family Court to represent Maurice Jr. and Taniya in the Article X proceeding, witnessed first-hand the strong bond between Tia and the children and the love and commitment they have for one another. Attorney Koleda reports that "both children were negatively affected and traumatized by this separation from their mother. . . .If [Tia] receives a sentence of incarceration, these children will likely suffer even more trauma from the prolonged separation."

16

The defense realizes that Maurice Jr. and Taniya are not unique in this respect; children often suffer when a parent is incarcerated. Nonetheless, the impact cannot be overstated. The Alliance for Children and Families, a national research and advocacy organization, states that the effects of parental incarceration on children are serious and pervasive:

> Children also appear to experience a wide-ranging set of behavioral problems as a result of parent incarceration and the expected trauma from separation. For example, Johnston (1995:76) lists a series of what she calls "trauma-reactive behaviors" seen in children of offenders: aggression, hypervigilance and other anxiety states, attention and concentration problems, and withdrawal. Poehlmann (2005a:692) described multiple emotional and behavioral reactions exhibited in young children following separation from mothers due to imprisonment that she found consistent with attachment theory (citing Bowlby, 1973). In his literature review of attachment theory Martin (2001:21) concluded that "we may make the reasonable conclusion that children who are reared in homes in which one parent is absent will be less able to form attachment to that parent, which will have an impact later in life. [...] Interference with attachment is predicted to have negative effects on the child's life, including their ability to become effective parents." Thus, it seems that a child separated from their parent through incarceration is at risk for developing problematic behavior to the extent that they are left unable to have, maintain and form healthy relationships with their parents and others.[11]

Obviously, the impact is more devastating when both parents are incarcerated. And, here, the impact is likely to be compounded because the children only recently returned to Tia's care. A second separation could leave a lasting, significant, and negative impact on the innocent children. S*ee Valenia v. United States*, 2012 WL 701227, at *2-3 (S.D.N.Y. Mar. 6, 2012)) (court should consider emotional and financial hardship on family members during a defendant's incarceration).

Tia reports that her children are already suffering in the situation they face presently. They experience anxiety and express fear over the prospect of losing her. Their plight is all the more painful for Tia because she knows it was caused by her and Hartley's actions.

---

[11] See http://www.alliance1.org/Research/articlearchive/No_Answers_Sept06.pdf

2. <u>Tia's Lack of a Criminal History</u>

Unlike many defendants who come before this Court and most of her codefendants, Tia falls within Criminal History Category I. *See* PSR ¶¶ 4 and 47-53. In addition, a background check revealed no adult or juvenile arrests.

3. <u>Tia's Minor Role in the Offense</u>

This conviction was Tia's first arrest having no prior involvement in the criminal justice system prior to the case before the Court. In addition, the Government, by stipulating to a minor-role adjustment (pursuant to U.S.S.G. §§ 3B1.2 and 2D1.1(a)(5)) and permitting her to plead to the lesser-included (b)(1)(C) charge, clearly acknowledges that Tia's involvement in the conspiracy was minor. But for Tia's actions during the search of the residence after Hartley's arrest and her subsequent confession of her limited role in the offense, it is unlikely that Tia's activities would have ever risen to a level for which they would have become known to law-enforcement. In fact, other than Tia's voluntary confession to officers, the voluminous discovery is silent as to Tia's involvement. Simply put, Tia illegal participation was so minor and isolated that she was not initially on the Government's radar.[12]

This argument is not intended to excuse Tia's conduct. Nor is it to suggest in any way the Government exercised its prosecutorial discretion improperly by subsequently charging Tia. It is intended to highlight Tia's limited role and that she is clearly the least culpable of all of the codefendant.

---

[12] At the very least, the Government initially decided not to charge Tia in the initial indictment. *See* Attached as Exhibit H, the Hartley Organization hierarchy chart the Government provided to the Magistrate Court during the arraignment of the 17 codefendants. Three points stand out from the chart: <u>all</u> of the charged defendants had prior criminal histories; none of their roles were described as minor or minimal (lowest was labeled a "Mid-Level Distributor"); and Tia was not listed on the chart.

4. Acceptance of Responsibility

Tia has fully accepted responsibility for her actions and expresses great remorse for her poor decisions and criminal conduct. At her plea, Tia voluntarily recognized the wrongfulness of her actions. She continues to recognize that her conduct was an embarrassment to herself and her loved ones, and especially irresponsible as a mother and a role model. Probation determined that Tia accepted responsibility and agrees that she is eligible for a three-level downward adjustment for acceptance of responsibility under U.S.S.G. §3E1.1(a) and (b). *See* PSR ¶¶ 4 and 36-46.

Although Tia did not cooperate against Hartley, she immediately admitted her involvement to law enforcement when first questioned, provided information about her conduct otherwise unknown to officers, and led them to a storage unit containing approximately $100,000 in Hartley drug proceeds.

5. Incarceration Not Necessary to Deter Tia in the Future[13]

Tia does not need to be incarcerated to understand the wrongfulness of her actions or to provide personal deterrence from committing any future crimes. Given Tia's life before and after, her actions were truly aberrant. Moreover, she has suffered greatly over the shame and stigma of her arrest and what will be a felony conviction. But most importantly, she is scarred by the knowledge that she has caused the community and especially her children great harm. These scars and the lessons she continues to learn from her experience will be in her memory forever and guide her in a positive direction.

---

[13] The defense will leave it to the Court to determine the need for and efficacy of general deterrence when balanced against the mitigation factors presented in this submission and during sentencing.

6. <u>Noncustodial Sentence is Sufficient to Provide Tia With Rehabilitation</u>

As discussed above, the Article X proceedings and Pretrial Supervision provided therapy, counseling and parenting skills. She was completely compliant with the Family Court and ACS's recommendations and requirements. The defense submits she exceeded expectations and was granted "trial discharge" considerably sooner than anticipated.

In addition, Tia has been fully complaint with her Pretrial Services supervision. Since her release on bail, Tia has been given considerable latitude by the Court, for which she remains grateful. She has not violated a single condition.

While we recognize that Tia's criminal acts were considerable, her plea for an alternative to incarceration sentence is not meant to minimize her actions. Tia's steadfast compliance with the Bronx Family Court orders, ACS services, and the Southern District Pretrial Services supervision demonstrates that she is amenable and well-suited for probationary treatment.

7. A Noncustodial Sentence Does Not Present the Court With Unwarranted <u>Sentencing Disparities</u>

A noncustodial sentence for Tia would not be disparate with sentences for her codefendants given the minor and limited role she played in the conspiracy. It would also not be disparate with sentences nationwide. In *Gall v. United States*, 552 U.S. at 54, the Supreme Court noted: "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." In the spirit of the Supreme Court in *Gall*, Tia's Guideline range does not remotely take into consideration her individual characteristics and circumstances and adherence to it would be unjust and contrary to the dictates of 18 U.S.C. § 3553(a). The defense submits

that, given Tia's participation in the charged conduct, her otherwise law-abiding life, her

post-arrest conduct, and the other factors presented herein, a noncustodial sentence would

be appropriate and warranted.

**<u>Conclusion</u>**

The background to Tia's participation in this crime is deeply personal and complex. Tia struggles on a daily basis with the pain her actioons have inflicted on others, particularly her children and grandmother. The defense contends that Tia has learned from her mistakes and will never repeat them. But more important than counsel's contentions, Tia's actions before and after her arrest demonstrate that she is particulalry amenable to supervised release. The defense feels very secure in Tia's future as a productive member of society. If provided an alternative to incarceration Tia will not pose a risk to society and will continue to work and provide a loving home for her children. Tia now comes before the Court with what I expect will be great humility, asking for the utmost lenience in determining her sentence. She will ask for a sentence that will give her a chance to remain in the community and with her family and best afford her an opportunity to amend for her crimes and fulfill her great promise. The defense submits that a balance of the mitigating factors with the sentencing purposes and goals articulated in 18 U.S.C. § 3553(a) warrants a noncustodial sentence.

For the reasons set forth above, the defense respectfully requests that the Court impose a noncustodial sentence, which is "sufficient, but not greater than necessary" to achieve the objectives of sentencing in this case.

> Respectfully submitted,
>
> /s/ *Stephen Turano*
>
> STEPHEN TURANO

cc:     Aline Flord, AUSA
        Ji'vonne H. Gilmore, USPO
        Michael Krouse, AUSA
        Stephanie Lake, AUSA
        Robert Sobelman, AUSA